## Moor, *in Equity, versus* Veazie *& al.*

When all the legal and beneficial interest in the subject-matter of a suit in equity has become vested in the plaintiffs, by assignment or otherwise, it is not necessary that former proprietors or assignors should join in the suit.

All the citizens of a country have, *by the common law,* an inherent right in common to navigate its navigable waters.

That right is not limited to tide waters, but extends also to navigable fresh-water rivers and lakes.

Of this right the citizens or subjects cannot be deprived, even by the government itself.

The common law accorded to the sovereign power the "care, supervision and protection" of this common right.

Upon the power which has this care, supervision and protection of a common right, is the duty to regulate its use in such a manner, that it shall be safe and convenient.

Moor *v.* Veazie.

This duty involves the right to remove impediments to that use.

This State has the right to make improvements in its navigable rivers, for the more safe, convenient and useful enjoyment of the common right of navigating them.

To render the common right more beneficial, the State may encourage new modes of navigation, and for that purpose may grant an exclusive use, (for a term of years,) of the waters in the new mode, as a compensation for the skill, expense and risk required for its introduction.

The constitution of this State invests the Legislature with "full power to make and establish all reasonable laws and regulations for the defence and benefit of the people, not repugnant to said constitution or that of the United States."

Whether an enactment is reasonable or for the benefit of the people, this court is not authorized to decide. That decision is confided to the Legislature alone.

The power, given to Congress, to regulate *commerce* with foreign nations and among the States, includes the power to regulate *navigation* with foreign nations and among the States, and extends both to salt and fresh waters, and beyond, as well as within, the ebb and flow of tides.

It is however restricted to such waters as can be employed in commerce between a State and foreign nations, or some other State.

It does not extend to those waters within a State, from which a vessel cannot be navigated to a foreign port or to another State.

The power given to Congress to regulate *commerce* with the Indian tribes does *not* include *navigation* with the Penobscot Indians, or, *as it seems,* with any of the Indian tribes whatever.

It is confined to that sort of trade, of which navigation constitutes no part.

A coasting license, granted to a vessel, plying upon the interior waters, from which it could not reach another State or a foreign nation, is unauthorized and inoperative.

The provisions of the Act of July 30, 1846, entitled an Act to promote the improvement of the navigation of the Penobscot river, are not repugnant to any of the provisions of the constitution of Maine, or of that of the United States.

BILL IN EQUITY. This is the case in which an injunction was ordered, as reported in vol. 31, page 360. It now comes up for an adjudication upon the general merits.

The substance of the bill is presented in the former report.

The following facts were agreed by the parties : —

Before the passage of the Act set forth in the bill, the Penobscot river above Oldtown had never been navigated.

Between tide water at Bangor and Oldtown, a distance of eight miles, said river is crossed by four dams, and is not now, nor ever was navigable. There is a railroad from Bangor to Oldtown which, since the filing of this bill, has been extended to the river at the steamboat landing at Oldtown. Before any improvements were made on the river, the plaintiff built the steamer, Gov. Neptune, and run her on said river between Oldtown and Piscataquis falls, from the 27th day of May, 1847, till the 8th day of July following, when she was arrested by the drought. In August of that year, the grantees under said act commenced making improvements on said river below Piscataquis falls, by removing rocks from the channel. During that season the sum of eight · hundred dollars was expended in said improvements. On the 14th day of October, 1847, said steamer, Gov. Neptune, re-commenced her trips, and continued them until arrested by the ice. On the 27th day of November, 1847, said steamer was run over Piscataquis falls to a place called Nicketow, about fourteen miles above Five Island rips. This was done at a high pitch of water. In the spring of 1848, the plaintiff built the steamer Mattanawcook. On the first day of August she was run to Lincoln, and laid up there till certain obstructions were removed at a place, called Mohawk rips, above said Piscataquis falls. In August of that year, plaintiff removed some large boulders from said rips, which had rendered the passage hazardous at all times, and entirely obstructed it for steamboats at all ordinary stages of the water. On said rips the plaintiff expended, during said season, three hundred dollars, which was the only improvement made that summer on the river, owing to the continued high state of the water. In the winter of 1848, the plaintiff expended at a place called "the Cook" two hundred and ·twenty-five dollars, in removing a ledge under contract with said Levi and Warren R. Young, two of the defendants; said "Cook" is within the town of Oldtown, and is above Oldtown falls "village" and "landing." From the 22d day of August, 1848, to the 2d day of July, 1849, said boats were run daily over their respective routes, except

when said river was obstructed by ice. In February and March, 1849, the plaintiff built the dams, described in his bill, for the purpose of passing his boats down behind some islands in said Piscataquis falls.

Being prevented from completing his dams by ice and freshet, he built a railroad from the foot of said islands to the head of said falls. Said railroad is two miles in length. Since the construction of said railroad, said dams have remained without being completed ; said railroad connects the steamboat route above said falls with the route below said falls, and was built before the filing of the plaintiff's bill. Since the filing of said bill and the granting of the injunction, the plaintiff has expended, in the bed of said river, in removing rocks and deepening the channel thereof, between Oldtown falls and Five Islands rips, between two and three thousand dollars, and has built, and is now running over the route, below said falls, another steamboat, called the Sam Houston, and is also now running the Gov. Neptune and Mattanawcook. The plaintiff's boats were arrested by the drought on the 6th day of July, 1849, and did not re-commence running until the 15th of October. The season of 1849 was a season of long continued and unusual drought, and the year 1848, a remarkable one, for a long continuance of high water on the river. In the periods of ordinary high water, said river was passable for boats of the peculiar construction of the plaintiff's boats, before any improvements were made on the river, except at Piscataquis falls and Mohawk rips. These were passable for a few days in the year only at a very high stage of the water. The removal of a few large boulders in Mohawk rips and the digging down of some rock bars have now rendered Mohawk rips navigable, when the other sections of the river are navigable.

Piscataquis falls can never be made passable with safety except in a high freshet, without a large expenditure. The improvements on the "Cook" were made to widen and straighten the channel, and render it passable at a very high stage of the water, when it otherwise would not be passable.

The improvements by the plaintiff have been chiefly confined to removing rocks and deepening a channel in the river, which channel at some places follows the raft channel, and at other places leaves the raft channel. The channel improved by the plaintiff, is at places narrow and crooked, and would not admit of two boats passing each other going in opposite directions. Since the improvements have been made, the plaintiff's boats can run on the river with two and one-half feet less water than was necessary before they were made. Said river is subject to high freshets in the spring, which soon subside, and the water falls to a moderate pitch early in the season.

The Penobscot river takes its rise and has its whole course in the State of Maine. The draught of plaintiff's boats is from twelve to fifteen inches when light, and about two feet when loaded. Plaintiff is assignee of said charter property and privileges under it, as set forth in the bill. Said steamer, Gov. Dana, was built by said Veazie, and run by said Levi Young and Warren R. Young, between Oldtown and Piscataquis falls from the 10th day of May, A. D. 1849, to the granting the injunction.

The city of Bangor is a port of entry, situate at the head of the tide on Penobscot river, and the steamer, Gov. Dana, was of burden of forty-six tons, custom house admeasurement, and was enrolled and licensed for the coasting trade at said port of Bangor.

The Penobscot tribe of Indians own all the islands in the Penobscot river above Oldtown falls, some of which they occupy. Said tribe of Indians always have been, and now are, under the jurisdiction and guardianship of this State.

*Moor*, plaintiff, *pro se*, with whom was Kelley.

That the court has jurisdiction, and that this process is the appropriate remedy, are points which have already been settled. *Moor* v. *Veazie*, 31 Maine, 360.

The only questions now open are, whether the Act of the Legislature is constitutional, and if so, whether the plaintiff

has so far complied with its conditions as to entitle him to the remedy here sought.

I. The Act confers powers; sect. 1, 2 and 5. It conveys rights; sect. 4. It imposes obligations; sect. 3.

These are all the essentials of a contract. The Act is, therefore, a contract, if the Legislature had jurisdiction of the subject-matter.

The Legislature has power to control the interior waters. Const. art. 4, part 3, sect. 1; R. S. chap. 126, sect. 1; Lord Hale, de jure maris, chap. 2, prop. 3; Spring v. Russell, 7 Greenl. 273; 4 Pick. 460; 5 Pick. 199; 1 Pick. 180.

The power has been exercised more than two hundred years, as may be shown by a multitude of private Acts, reaching even to the farthest interior of the State.

The Legislature is empowered to make all "reasonable" laws "for the benefit of the people," not repugnant to the constitution of the State or of the United States.

Suppose a canal had been authorized, along the bank of the Penobscot river, to be fed from its waters. Such have been established in Connecticut, New York, Massachusetts, Pennsylvania, &c. Who could doubt the validity of such charters? If authorized to canal upon land, much more so, in the bed of a public river; for, in the former case, there would be the taking of private property; in the other, only the regulation of a public right. This public right extends to waters "floatable," though not "navigable," within the rules of the common law.

[The plaintiff here offered a long list of private Acts, passed since the formation of this State, which he said were passed in the exercise of the legislative power over the interior waters, and as being demonstrative of a correspondent usage. He particularly commented upon the Act, giving to Seward Porter the exclusive right to navigate the Kennebec river by steam.]

But we stand not upon usage. We go to the fountain, the common law. I refer especially to the tracts of Lord Hale, received as doctrine in this State.

Moor *v.* Veazie.

As to the *use* of our rivers, they have always been subject to legislative control. What effect upon our bridges, canals, booms, dams, mills and a multitude of aquatic rights, would result, at this day, from a withdrawal of the power ?

Neither is the Act in conflict with the constitution of the United States. *Livingston* v. *Van Ingen*, 9 Johns. 507 ; *Gibbons* v. *Ogden*, 17 Johns. 488 ; *Ogden* v. *Gibbons*, 4 Johns. Ch. 150 ; *Gibbons* v. *Ogden*, 9 Wheat. 1 ; *N. R. S. Nav. Co.* v. *Livingston*, 3 Cow. 713 ; *Brown* v. *Maryland*, 12 Wheat. 419 ; *Wilson* v. *B. Bank*, 2 Peters, 251 ; *New York* v. *Miln*, 11 Pet. 158 ; *Warren Bridge Case*, 11 Pet. 420 ; *United States* v. *New Bedford Bridge*, 1 Wood. & Minot, 401 ; 7 Howard, 283.

II. Has the plaintiff, then, so far complied with his charter as to be entitled to the remedy here sought ?

*Paine*, for the defendants.

For the purposes of the present trial, that position will not be controverted.

*Moor.* — The agreed statement of facts admits the defendant's interference. The case, then, must be with us, and we move that the injunction be made perpetual, both against the further use of the defendant's boat, and against injury to our improvements, and that a master in chancery be appointed to assess the damages.

*A. W. Paine*, for defendants. ·

I. Plaintiff's charter is void ; its enactment not being within the power of the Legislature, as granted by the constitution of Maine, art. IV, part third, § 1.

1. Because not " reasonable."

2. Because not " for the benefit of the people."

The river was by nature navigable for steamboats, and of course free to all. This right, thus common to all citizens, the Legislature had no power to take away without a just compensation. *Improvements* merely, of a navigable river, to be enjoyed by the maker alone, do not afford a good consideration for depriving the citizen of his natural rights ; and

any act of the Legislature having that effect, is both unreasonable and not for the benefit of the people. And where any such act jeopards the rights of the citizen, a court of law is bound to declare it a nullity. *Pierce* v. *Kimball*, 9 Greenl. 60.

It is conceded that the Legislature have the power to grant monopolies in the enjoyment of any rights or property, brought into existence by the grantees, as in cases of railroads, canals, bridges, &c.; and that they have equal power to substitute one right of the citizen for another of similar kind, as was the case in *Spring* v. *Russell*, and other cases cited by plaintiff; and to grant exclusive privileges in all cases, where the consideration, received in return by the citizen or state, is just and ample; but where vastly important rights are taken away, without such compensation in return, as is the case here, it is contended, that the act does not fall within the constitutional power of the Legislature. *Cottrell* v. *Myrick*, 3 Fairf. 222; *Bloodgood* v. *M. & H. R. R. Co.* 18 Wend. 61; 2 Kent's Com. (5th Ed.) 339 and 340, and in notes; *City of Boston* v. *Shaw*, 1 Metc. 135.

The private property of one cannot be taken for the private uses of another in any case. *Props. &c.* v. *Laboree*, 2 Greenl. 290.

II. The charter in question is in violation of the constitution of the U. S. art. 1, § 8, clause 3.

"*Commerce*" the exclusive power of regulating which is vested in Congress, includes *navigation*, which term embraces the vessel, its management and the control of the waters on which it moves. *Gibbons* v. *Ogden*, 9 Wheat. 189 and 193; 2 Story's Com. on Con. § 1060.

What is the true criterion or rule for the exercise of this power by Congress, is the question now presented. Does the power extend to, and embrace navigable waters, situated wholly within the limits of a single State, and not approachable from the sea?

1. It is very clear, that the power is not limited to tide waters, or those known, as "navigable" by the common law.

And it is equally clear, that it is not limited to such waters as are approachable from the sea. On very few of the navigable rivers of the country is the limit of tide water co-terminous with their navigability ; and a vastly important part of the navigation of the country is on waters, not by nature approachable from the sea. By adopting these criterions, all the commerce of the great lakes, of Lake Champlain, and of the Mississippi and tributaries would all be excluded.

Nor can it be contended that the true criterion is, whether the waters divide States, or pass into different States. The Hudson above the line of New Jersey, the Penobscot to Bangor and the Kennebec to Augusta, are clearly within the power in question. See cases below.

2. It is contended that the power in question is co-extensive with the subject itself ; that wherever commerce and navigation, as defined by Congress, exists, there the right to regulate it exists also.

The reason of any particular provision of the constitution affords a good rule for its construction. C. J. MARSHALL, in 12 Wheat. 441.

Hence the power to regulate *importation* being given, Congress has exclusive power to pass laws regulating the *sale* of imports. *Brown* v. *Maryland*. 12 Wheat. 419.

Also for the protection of imported goods against thieves. *U. S.* v. *Coombs*, 12 Pet. 78.

And for their transportation over land and innavigable waters. *Gibbons* v. *Ogden*, 9 Wheat. 196 ; *Waring* v. *Clarke*, 5 Howard, 463.

And also to give the most complete effect to maritime jurisdiction. *U. S.* v. *Bevans*, 3 Wheat. 336.

3. *The coasting trade* is an essential part of the commerce of the United States, the exclusive power over which is in Congress. This embraces all ships and vessels " found trading between district and district, or *between different places in the same district.*" Act of 1793, chap. 8, sect. 6 ; 3 Cow. 746.

This "comprehends all navigation within the limits of ev-

ery State in the Union, so far as it may be, *in any manner*, connected with commerce with foreign nations, or among the several States, or with the Indian tribes." *Gibbons* v. *Ogden*, 9 Wheat. 197.

The express language of the decree, in that case, includes the case at bar. Page 240.

Neither the language of the statute nor of the court requires, that this "connection" should be by an uninterrupted *water* communication, but the reason and spirit of the enact-' ment equally applies, whether 'this connection is wholly by water, or partly by land. Congress have interfered to regulate commerce by land in such cases, and the court have sanctioned such an exercise of power. *Gibbons* v. *Ogden*, 9 Wheat. 196.

The same reason exists with respect to goods shipped from Lincoln over the waters in question, via Bangor to Boston, as exists in case of goods shipped at Chicago, via Albany to the same place. In both cases the waters passed, form a part of the line of connection, by which the commerce of different States is carried on.

4. The *action of Congress recognizes the correctness of our position.* The statute of 1838, chap. 191, for security of the lives of passengers on board of steamboats, and the additional Act of 1843, chap. 94, both embrace all steamboats, "transporting passengers in or upon the bays, lakes, rivers or other navigable waters of the United States." All steamboats wherever plying in the United States, are subject to this law, and its constitutionality and binding effect upon such has been judicially recognized. Plaintiff's boat is subject to it. *Waring* v. *Clark*, 5 Howard, 465.

The word "navigable" is very clearly not used here in its common law sense, and no definition can be given to the term, which would not exclude the waters of the Mississippi above the reach of the tide and the whole of the lakes, as well as the waters in question.

The uniform action and decision of Congress and the Supreme Court has been to include within the power of the

Moor *v.* Veazie.

former, all waters upon which the coasting trade can be carried on in their natural state. The waters in question being of that character, it is submitted whether the U. S. have not the exclusive power claimed for them.

I respectfully submit, too, that the suit, if any, should have been brought, not in the name of the plaintiff, but in that of the Penobscot River Navigation Company, as given in the 5th section of the plaintiff's charter.

Shepley, C. J. — The cause, after argument, is submitted for decision upon the bill and answers and upon an agreed statement of the facts.

By virtue of an Act approved on July 30, 1846, the plaintiff claims the exclusive navigation, by boats propelled by steam power, of that part of the Penobscot river above the town of Oldtown, so far up as it may be rendered navigable for such boats, by virtue of the Act.

By the first section, William Moor and Daniel Moor, jr., their associates and assigns, are authorized to improve the navigation of the river above that town ; and for that purpose to perform certain acts in the bed of the river.

By the second section they are authorized to hold land upon the banks of the river, and to appropriate certain property of the riparian proprietors, and to flow their lands upon payment of damages.

The third section declares, that the grant is made upon condition, that they shall within seven years improve the navigation of the river " from Oldtown to Piscataquis falls, and from Piscataquis falls to the foot of the Five Island rips, and shall build and run over said route a steamboat, and shall within seven years build a canal and lock round said falls, or a railroad to connect the route above with the route below said falls."

The fourth section grants to them, their associates and assigns, upon performance of the condition " the sole right of navigating said river by boats propelled by steam from said Oldtown as far up, as they shall render the same navigable"

" for the term of twenty years, from and after the comple-
tion of the improvement as provided in the third section of
the Act." It also prohibits the obstruction of the navigation
for certain other purposes ; and provides, that boats not propelled
by steam power, shall be allowed to make use of any locks
and other improvements upon payment of a reasonable toll.

The fifth section authorizes them to become a body cor-
porate, by the name of the Penobscot River Navigation Com-
pany, with the powers incident to corporations described and
defined in the seventy-sixth chapter of the Revised Statutes,
" provided, that they shall at any time during the continu-
ance of the grant, elect by a vote of a majority in interest,
and proceed to organize under, and according to the provis-
ions of said chapter of the Revised Statutes."

The bill alleges, that the conditions required by the Act
have been performed, and that the plaintiff has become by as-
signment entitled to all the rights and privileges granted by
the Act. It is admitted, that he " is assignee of said charter,
property and privileges under it as set forth in the bill."

The objections which have been made to the maintenance
of the suit, and to the decree prayed for, will be noticed in
their order.

1. The jurisdiction of the court was examined upon a
motion for an injunction pending the suit, and the objection
made to it, was overruled by an oral opinion, notes of which
were taken by an intelligent member of the bar, which appear
to have been published in the Law Reporter, vol. 12, No. 6,
(see also, 31 Maine 365,) in a manner, that might lead a reader
to the conclusion, that a maturely considered opinion had
been drawn in writing. It may not be useful to present
the reasons in a more perfect manner.

2. The performance by the grantees and their assignees of
the conditions required by the third section of the act ; what
was required by a correct construction of the Act, and how
far the defendants were entitled to make the objection, were
noticed in the same oral opinion. As the objection has not

been renewed, it may not be useful to enter upon any further discussion of these matters.

3. The right of the plaintiff to maintain the suit in his own name, and not in the name of the corporation is for the first time denied.

The law is different as administered in courts of equity and courts of law, respecting parties plaintiff. Courts of equity do not so much regard technical difficulties, as they do the fact, that the suit is prosecuted by those, who represent the entire legal and beneficial interest to the matter in litigation. Hence assignees of all the interest to rights and contracts may maintain suits respecting them in courts of equity. *Whitney* v. *McKenney,* 7 Johns. Ch. 144; *Trewthick* v. *Austin,* 4 Mason, 41.

Holders of shares in corporate bodies may, under certain circumstances, maintain suits against their officers and against other shareholders. *Gray* v. *Chaplin,* 2 Sim. & Stu. 267; *Hichens* v. *Congreve,* 4 Russ. 562.

But a suit cannot be maintained by all or any portion of such shareholders, involving the interest of the corporation, unless the corporation itself will be bound by the judgment. In this case the plaintiff appears to be the sole assignee and owner of the corporate franchise, if such there be, and it might be difficult to determine, that the corporation would not be bound by the judgment, or that it was absolutely essential, that the suit should be prosecuted in the corporate name. It is not, however, necessary to decide this question, for the rights and privileges granted do not appear to have become vested in a body corporate. They were granted to the persons named in the Act, and to their associates and assigns, and not to a corporation. There is no proof, that they have been conveyed to one.

The plaintiff is admitted to be the sole owner, which is inconsistent with any other ownership.

The grantees by the Act are not constituted a body corporate, except upon certain conditions precedent. The privilege of becoming such a body at any future time during a contin-

uance of the grant, is accorded to them. They can become such a body only, when a majority in interest elect to avail themselves of that privilege, and to organize according to the provisions of statute, chap. 76.

There is no proof, that a majority in interest have at any time elected to become a corporate body, or that they have organized as such according to the provisions of the statute. And no proof therefore of the potential existence of such a corporation, as that named in the Act. The objection cannot prevail.

4. The provisions of the Act are alleged to be repugnant to the provisions of the constitution of this State.

All the citizens of a country have by the common law a right in common to navigate its navigable waters. This is an inherent right, of which they cannot be deprived by the sovereign of any government, based upon an acknowledgment of the rights of its citizens. This is in substance the conclusion, to which the court came in the case of *Williams* v. *Wilcox & al.* 1 Willmore, Wallaston & Hodges, 477, in which the right of the British sovereign to destroy a common right of navigation in tide waters, was very elaborately investigated both by the bench and the bar. The defendants have a right in common to the navigation of the Penobscot river ; but the proof does not show, that by reason of being riparian proprietors or otherwise, they have any rights superior to those of other citizens. The right in common of all the citizens to the use of its navigable waters has been established by judicial decisions ; and that right is not limited in this State to waters, in which the tide ebbs and flows, but is admitted in lakes and fresh water rivers, which are navigable. *Berry* v. *Carle*, 3 Greenl. 269; *Wadsworth* v. *Smith*, 2 Fairf. 278 ; *French* v. *Camp*, 18 Maine, 433; *Brown* v. *Chadbourne*, 31 Maine, 9. In the province of New Brunswick it was fully admitted in such waters by a decision based upon the common law, in the case of *Esson* v. *McMaster*, 1 Kerr. 501. The same doctrine has been admitted in most of the States of the Union, either by regarding fresh water rivers as

navigable waters, or by regarding them as common ways for passage and transportation. *Scott* v. *Willson*, 3 N. H. 321; *Commonwealth* v. *Chapin*, 5 Pick. 199; *Palmer* v. *Mulligan*, 3 Caines, 307; *Pethin* v. *Olmstead*, 1 Root, 217; *Cason* v. *Blazer*, 2 Binn. 475; *Wilson* v. *Forbes*, 2 Dev. 30; *Cox* v. *The State*, 3 Blatch. 193; *Bullock* v. *Wilson*, 2 Port. 436.

The common law accorded to the sovereign power, the "care, supervision and protection" of this common right of navigation in navigable waters, whether fresh or salt. Hale, *de jure maris*, chap. 4, prop. 3. This treatise has been received with approbation in most of the States as a correct exhibition of the law on those subjects, of which it treats. The power which has the " care, supervision and protection" of a common right, is bound to regulate its use in such manner, that it may be safe and convenient. The duty to make the use safe and convenient involves the right to remove obstructions, to improve, or to render more safe and convenient the waters for the purposes of navigation. The right to improve navigable waters is therefore accorded to, and it exists in the sovereign power, which is entitled to regulate the use of such waters for the purposes of navigation. The common law conceded to the sovereign power, the care, supervision, protection, regulation and improvement of navigable waters, that no one might be molested in the enjoyment of the use of them, or debarred of the exercise of his common right. Without regulation or without improvement, the enjoyment might be unsafe, inconvenient, or useless.

When several of the States of this Union, formerly subject to the British sovereignty, severed the ties, that bound them to it, their respective citizens became possessed of the sovereign power in their States, and entitled to exercise the rights over navigable waters, which were formerly vested in the British crown. This they could not well do without a delegation of these rights to some form of government. Having formed a State government they yielded the exercise of these rights to it, and the State governments thus became rightfully

entitled to the care, supervision, protection, regulation, and improvement, of the navigable waters within the States respectively in a manner not inconsistent with the provisions of their respective constitutions. These rights, or this power they still retain so far, as it has not been granted or delegated to the government of the United States. This State has therefore the right to make improvements in its navigable rivers and waters for the more safe, convenient and useful enjoyment of the common right of navigation in them.

When the people are in the enjoyment of that common right in several different modes, their rights or privileges are not, necessarily in any degree impaired or abridged by the introduction of another and new mode of using the waters for passage and transportation. The use of the waters in the accustomed modes may be rendered more safe and convenient by the improvements required for the introduction of the new mode. If the State may rightfully permit or restrain the introduction of a new and particular mode of navigation without prejudice to the common right of use in the accustomed manner, it may do so upon such terms and conditions, as it may judge to be expedient. And may therefore encourage its introduction, by a grant of the exclusive use of the waters in that mode for a term of years, as a compensation for the skill, expense, and risk required for its introduction. This it may do without an infringement upon, or a diminution of the common right of navigation existing at the time.

The agreed statement of facts does not show, that the navigation of the Penobscot river, in the accustomed manner, must necessarily be injured, or that it has in fact been injured, or that the rights of the defendants or of any other citizen to such use, have been impaired or abridged by the introduction of a new mode of navigation by the Act, by boats moved by steam. It does not therefore appear, that any existing rights have been invaded or diminished by the passage of the Act.

The right of the State, however, to impair and diminish the common right of passage and of transportation, in the

accustomed manner, for the purpose of increasing the facilities for its more safe, convenient and useful exercise in another manner, has been asserted and exercised in most of the States; and in many of them, with the sanction of their highest judicial tribunals.

Permission has been given to erect dams, which impeded the navigation of rivers, to increase the facilities for their navigation, by means of canals and locks; and for the use of their waters to feed canals not useful for their own navigation. To place booms in and across navigable rivers to facilitate the floating of logs and lumber. To change the channel of rivers, by which the navigation of them, as formerly enjoyed has been entirely destroyed, to facilitate it in a new channel.

- Permission has also been given to erect dams, bridges, cause-ways, and other obstructions, impeding the navigation not for the purpose of giving greater facilities in another mode, but for the promotion of a common benefit in a manner entirely disconnected with navigation. Such as dams, to create a water power for different manufacturing purposes, and to control and withdraw the water to supply aqueducts; and bridges and cause-ways to facilitate intercourse by land. *Spring* v. *Russell,* 7 Greenl. 273; *Proprietors of Side Booms* v. *Haskell, idem,* 474; *Cottrill* v. *Myrick,* 3 Fairf. 222; *Parker* v. *The Cutler Mill-dam Co.* 20 Maine, 353; *Lebanon* v. *Olcott,* 1 N. H. 339; *Woods* v. *The Nashua Manfu. Co.* 4 N. H. 527; *Commonwealth* v. *Breed,* 4 Pick. 460; *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 445; *Boston Mill Dam* v. *Newman,* 12 Pick. 467; *Mayor of Charlestown* v. *County Commissioners of Middlesex,* 3 Metc. 202; *Kellogg* v. *Union Com.* 12 Conn. 7; *Enfield Toll Bridge Co.* v. *The Hartford & New Haven R. R. Co.* 17 Conn. 40; *Lansing* v. *Smith,* 8 Cow. 146; *The People* v. *The Rensselaer & Saratoga R. R. Co.* 15 Wend. 113; *Zimmerman* v. *The Union Canal Co.* 1 Watts & Sergt. 346; *Susquehanna Canal Co.* v. *Wright,* 9 Watts & Sergt. 9; *Commonwealth* v. *Fisher,* 1 Penns. 462; *Monongahela*

*Navigation Co.* v. *Coons,* 6 Watts & Sergt. 101; *Gavit* v. *Chambers,* 3 Ham. 495; *Hogg* v. *Zanesville Canal & Man. Co.* 5 Ham. 410; *Willson* v. *The Blackbird Creek Marsh Co.* 2 Peters, 245; *The City of Georgetown* v. *The Alexandria Canal Co.* 12 Peters, 91; *United States* v. *The New Bedford Bridge,* 1 Woodb. & Min. 401.

Many other cases might be cited, as well, if not better, suited to illustrate and establish the rightful exercise of such a power.

The provision contained in the constitution, that the Legislature " shall have full power to make and establish all reasonable laws and regulations for the defence and benefit of the people of this State, not repugnant to this constitution nor to that of the United States" is especially relied upon.

The argument attempts to prove, that the Act is not a reasonable one; that it is not for the benefit of the people ; and that it is the right and duty of this court to judge of it in both those respects.

The Legislature must of necessity judge of these matters in the first instance. This court is not authorized to decide whether an enactment of the Legislature, which by the constitution it is clearly entitled to make, is reasonable or for the benefit of the people.

The Legislature is expressly authorized to establish inferior courts. It does establish one. This court cannot decide, that it was not reasonable, or for the benefit of the people, that such a court or one of such a character should be established. To do so would be to violate the constitution and cause a conflict between these two departments of the government. When the Legislature decides, that an Act is reasonable and for the benefit of the people, as it does by making the enactment under the sanction of an oath to support the constitution, that decision must be conclusive, if the enactment be not repugnant to any provision of the constitution, and be not made colorably to effect one purpose under the appearance of effecting another.

If the Legislature should authorize private property to be

taken ostensibly for public use, when it is apparent by the enactment itself, that it was intended to be taken for private uses only, it would be the duty of this court, in a case properly presented, to examine and decide upon its character ; and it would not be bound by any declaration of the Legislature, that the property was taken for public use. But when the question is one of expediency merely the decision of the Legislature, that it is reasonable and for the benefit of the people, is conclusive.  *Spring* v. *Russell*, 7 Greenl. 273 ; *Parker* v. *The Cutler Mill Dam Co.*, 20 Maine, 353 ; *Commonwealth* v. *Breed*, 4 Pick. 460 ; *The People* v. *The Saratoga and Rensselaer R. R. Co.*, 15 Wend. 132.  The cases cited by the counsel for the defendants do not authorize a different conclusion.  The remark referred to in the case of *The City of Boston* v. *Shaw* was made respecting a by-law, and not respecting a legislative enactment.

Whether it was expedient and in that sense reasonable, and for the benefit of the people to grant for so long a period, the exclusive navigation by boats moved by the power of steam, of that part of the Penobscot river, to induce persons of skill to incur the risk to be anticipated by their introduction and use, is a question, which this court is not authorized to entertain and decide.  It does not find any provision of the Act to be repugnant to any of the provisions of the constitution of this State.

5.  The provisions of the Act are alleged to be repugnant to that clause of the constitution of the United States which declares, Congress shall have power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

In the consideration of this question it will be admitted, that commerce includes navigation, and that the regulation of it includes the regulation of navigation, without regard to the kind of vessel employed, or the kind of waters, in which it is floated, or the kind of power by which it is moved.   And without intimating any opinion upon the controverted ques-

tion, whether Congress has the exclusive power to regulate commerce to the extent of the grant, its exclusive power to do so will be admitted, for the consideration of this case.   That part of the power of Congress to regulate commerce, will only be considered which authorizes it to regulate navigation. The inquiry therefore will be limited to the extent of the power of Congress to regulate navigation.   The three different branches of the power to regulate commerce will be separately considered so far only, as that power extends to the regulation of navigation.

The first gives the power to . regulate navigation with foreign nations.

The exercise of this power is not limited by the bounds of any State.   Vessels may be authorized to navigate waters within the bounds of a State, and to pass through a State, if it be practicable to do so while employed in this class of commerce.   The power was conferred without regard to the jurisdiction of the States.   The limits of a State do not constitute any portion of the elements, by which the extent of the power is to be ascertained and determined ; nor does the kind of waters, in which the vessel is navigated.   The exercise of the power is not restricted to waters, in which the tide ebbs and flows.   There may be commerce and navigation of this class upon fresh water lakes and rivers, and to the regulation of such navigation the power will extend.

This exercise of power is however restricted in these and in all other waters to the regulation of such navigation as can be employed in commerce with foreign nations.   It is restricted by the natural limitation existing upon the practical and possible use of the waters for purposes of commerce with foreign nations.   If a vessel cannot be navigated from waters within a State to a foreign port, the right to regulate the navigation upon such waters is not embraced by the terms, by which the power is granted.   On the other hand when a vessel can be navigated from a port or place, within any of the States of the Union, to a foreign port or place, the United States may authorize it to navigate those waters, and no law

of a State can prevent it. From whatever ports or places within any of the States situate on tide waters, or on fresh water rivers or on fresh water lakes, a vessel can be navigated to a foreign port or place, there the laws of the United States may reach to secure and to protect her right to that navigation. Beyond this, such laws cannot reach for such a purpose. Upon waters not included within such limits, whether they be salt or fresh, vessels may be navigated without submission to the laws of the United States. To their regulation her laws do not and cannot extend. Their regulation is one of those rights not by this branch of the power conferred upon the United States, but is one of those reserved to the States, to be exercised by them with the same freedom and to the same extent, as it might have been, if they had never become members of the Union. The extent, to which the power of Congress to regulate navigation has been conferred, and to which it may be exclusively exercised, is ascertainable by ascertaining the simple fact, whether a vessel can be navigated from a port or place within the United States, to a port or place within a foreign country.

The second branch confers the power to regulate navigation " among the several States."

This power may also be exercised by Congress within the jurisdiction of the States, and upon fresh as well as upon tide waters with respect to vessels, which can carry on commerce among the States. Those vessels, and those only can be employed in such commerce, which can be navigated from some port or place within one State, to some port or place within another State. If they cannot be so navigated, they cannot be employed in commerce among the States. Congress may regulate the navigation of a vessel in all waters without regard to their distinguishing character, in which a vessel can be navigated from a place in one State to a place in another State; and this may include the navigation in waters between different ports or places in the same State, because such waters can be used for purposes of navigation among the States. Navigation upon the waters of

a State, which cannot be thus used, is not comprehended by the terms, in which the power is confided to the United States. It is subject to regulation only by the laws of the State, in which it is employed.

These rules are subject to a single exception; when a river, pond, or small lake, incapable of use for general purposes of navigation, constitutes the boundary in whole or in part, between the United States and a foreign country, or between different States of the Union, the passage of ferry boats and row boats from bank to bank above falls or rapids, which wholly obstruct the passage of vessels by them down the current, will afford no evidence, that the navigation upon these waters can be subject to regulation by the power of Congress.

No judicial decision has been noticed, which denies to a State the right to regulate the navigation upon its interior waters, which cannot be navigated in the manner before stated for purposes of commerce with foreign nations or among the several States. On the contrary, that right has been admitted in those judicial opinions which have been considered to advance the most extensive claims to the regulation of commerce and navigation by the United States.

In the case of *Gibbons* v. *Ogden*, 9 Wheat. 194, MARSHALL, C. J., observes, "Comprehensive as the word ' among' is, it may very properly be restricted to that commerce, which concerns more States than one. The phrase is not one, which would probably have been selected to indicate the completely interior traffick of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce, to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated ; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State." When speaking of the proper legislation of the States, the opinion states, " Inspection laws, quarantine laws, health laws of every

description, as well as laws for regulating the internal commerce of a State" are parts of the mass. Again, "If Congress license vessels to sail from one port to another in the same State, the act is supposed to be necessarily incident to the power expressly granted to Congress, and implies no claim of a direct power to regulate the purely internal commerce of a State."

With all deference it is submitted, that the power last named need not be claimed, and that it does not accrue as an incidental or implied power, that it is expressly granted by being necessarily included within the limits, to which the right of the United States to regulate commerce extends by the terms of the grant; and excluded from the limits, to which the right of a State to regulate its internal commerce may extend.

Mr. Justice McLean observes, in his opinion in the *Passenger Cases*, 7 How. 283, "Over the navigable waters of a State Congress can exercise no commercial power, except as regards an intercourse with other States of the Union or foreign countries." "All commercial action within the limits of a State, and which does not extend to any other State or foreign country is exclusively under State regulation. Congress can have no more power to control this, than a State has to regulate commerce with foreign nations and among the several States."

Mr. Justice Wayne, in his opinion in those cases, observes, "Those regulations which affect only the commerce carried on within one State, or which refer only to subjects of internal police, are within the powers reserved.

To Congress is granted the power to regulate commerce "with the Indian tribes."

No judicial opinion is known to have determined, that this branch of commerce included navigation. It was not the subject of examination in those cases, which decided, that commerce did include navigation."

The admission, that commerce includes navigation, is not intended to include commerce with the Indian tribes.

The language must have been used with reference to such commerce with them as was known to have existed. The

treaties made with them before the Union, and the ordinances made by Congress under the confederation recognize and provided for trade or traffick with them. But no national, conventional or statute law, or ordinance is known to have recognized or authorized navigation to be carried on with any Indian tribe. No vessel, it is believed, had then or has since entered or cleared as arriving from, or proceeding to the territory of any such tribe. The grant was made to regulate a commerce, which had at the time a well known character. Hence CHIEF JUSTICE MARSHALL, while presenting reasons for the conclusion, that the commerce, of which he was speaking included navigation, observes, "All America understands, and has uniformly understood the word commerce to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed." Let the same rule be applied to ascertain the meaning of commerce with the Indian tribes, and it will not be found to include navigation, but to include trade or traffick in goods and merchandize between those tribes and other persons.

Whatever may be the extent of the power, it cannot be construed to authorize Congress to regulate navigation upon the waters of a State, which cannot be used for purposes of commerce with foreign nations, or among the several States, without overruling the uniform declarations contained in the opinions of the Supreme Court of the United States, that the power to regulate commerce does not authorize the regulation of navigation on waters, which cannot be used for such purposes.

"The Indian tribes" referred to, were those tribes which were in a condition to determine for themselves with whom they would have commerce, or in a condition to have Congress determine it for them; and not those small tribes or remnants of tribes yet denominated tribes, which had before that time and have ever since continued to be under the control and guardianship of a State, and were without power to carry on commerce or trade, except by permission and under the regulation of the State laws.

Moor *v.* Veazie.

That the Penobscot tribe of Indians were, when the constitution of the United States was framed and adopted, under the complete control of State laws, and without the power to conduct commerce or trade, except by permission of a State, will appear by a reference to State enactments.

So early as the year 1633 the general court of Massachusetts ordered " that no person whatsoever shall henceforth buy any land of any Indian, without license first had and obtained." In 1650 the French, Dutch and other foreigners were forbidden to trade with them. In 1657 that Commonwealth declared its right to all the fur trade with them, and forbid others to trade with them in furs. It had before that time forbidden the sale to them of guns, gunpowder, and other munitions of war. In 1693 an Act was passed " for the better rule and government of the Indians in their several places and plantations."

The first section provided for the appointment of persons " to have the inspection and more particular care and government of the Indians in their respective plantations ;" and these persons were authorized to determine pleas betwixt party and party, and to punish criminal offences. Such a course of legislative control was, it is believed, continued until this State was separated from Massachusetts, although contracts denominated treaties were made with them by the State, for the relinquishment of their title to lands. By the Act of separation this State assumed the performance of all the obligations made by Massachusetts to the Indian tribes within her jurisdiction ; and in the year 1821, passed an Act for the regulation of the Penobscot and Passamaquoddy tribes of Indians.

These laws will be ascertained by a reference to the ancient charters and statutes of Massachusetts, under the title, Indians. Neither the Congress under the confederation, nor the government of the United States, appear to have at any time exercised any control over, or to have made any contract or treaty with the Indians within the jurisdiction of Massachusetts or of this State. Vide American State Papers, title, Indian Affairs.

By the agreed statement it appears, that the Penobscot tribe of Indians " always have been, and now are under the juris- .diction and guardianship of this State." This tribe cannot therefore, be one of those referred to in the constitution of the United States.

The conclusion must be, that commerce with the Indian tribes did not include navigation, and if it did, that the Penobscot tribe was not one of the tribes referred to in the constitution.

It appears from the agreed statement of facts, that the boat owned and navigated by the defendants, was enrolled and licensed for the coasting trade at the port of Bangor.

This can be of no importance, if she cannot carry on that trade. The power of Congress to regulate commerce, can neither be enlarged nor diminished by a grant of, or by a refusal to grant, a coasting license. Such a license, when received by a vessel, exclusively and necessarily employed in the waters of a State, which cannot be used to carry on commerce with foreign nations or among the several States is wholly inoperative. It would be unauthorized by the laws or constitution of the United States.

It further appears by the agreed statement, that the Act granting the exclusive navigation by steam power, does not apply to any part of the Penobscot river, which is within eight miles of any place, from which a vessel can be navigated to a foreign port or to a port in another State. It is limited to that part of the river, from which no vessel can proceed and pass out of the limits of the State.

The provisions of the Act are not therefore, repugnant to any provision of the constitution of the United States.

A decree may be drawn by counsel and entered, to prohibit by injunction the defendants from navigating by boats propelled by the power of steam that part of the Penobscot river, in which a grant is made of the exclusive right of navigation in that mode, so long as such exclusive right shall continue ; and for the recovery of costs.