STATE of Maine

v.

Albert C. DANA, Jr.

STATE of Maine

v.

Allen J. SOCKABASIN.

Supreme Judicial Court of Maine.

July 3, 1979.

John M. R. Paterson (orally), David Rose-
man, William Laubenstein, Asst. Attys.
Gen., Augusta, for the State.

Edward J. Shawaker (orally), Jacques B. Gelin, Dept. of Justice, Washington, D.C., George J. Mitchell, U.S. Atty., District of Maine, Portland, for amicus curiae, United States.

Brown & Tibbetts by John A. Churchill, Jr. (orally), Calais, for defendants.

Thomas N. Tureen (orally), Native American Rights Fund, Portland, Richard B. Collins, Native American Rights Fund, Boulder, Colo., for amicus curiae, Joint Tribal Council of Passamaquoddy Tribe.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY, and NICHOLS, JJ.

WERNICK, Justice.

The appeals in this case raise an important question of federal-state relations in what has continued to be, since our nation's beginnings, the sensitive area of criminal jurisdiction over Indians.[1] The issue is: Does 18 U.S.C. § 1153 (1970 ed.), the current version of the Major Crimes Act of 1885, prevent the State of Maine from exercising jurisdiction over the crime of arson as allegedly committed by two Passamaquoddy Indians on certain land in Maine inhabited by Indians known as the "Passamaquoddy Tribe"? The resolution of the question turns on the meaning, and reach, of "all dependent Indian communities", one of the alternative phrases used by Congress in 18 U.S.C. § 1151 (1976 ed.) to define "the Indian country" brought within the exclusive jurisdiction of the federal government when certain enumerated crimes are committed there by Indians.[2]

We have arrived at an understanding of the meaning, and scope, of "all dependent Indian communities", as a criterion of the existence of "Indian country", which leads us to conclude that the term embodies an expansive federal concern with matters affecting Indians which was not fully recognized by the Superior Court when it failed to arrest the judgments of conviction now before us. We therefore sustain the appeals from those judgments and remand to the Superior Court for further inquiry, in accordance with guidelines hereinafter provided, into the question whether the status of the "Passamaquoddy Tribe" and its lands brings this arson case within the jurisdiction of the federal government to the exclusion of the jurisdiction of the State of Maine.

1.

Separate indictments returned May 3, 1977 in the Superior Court (Washington County) charged that defendant Albert C. Dana and defendant Allen J. Sockabasin, respectively,

1. Because of the importance of the question we permitted the United States, through its Department of Justice, to file a brief and argue orally, as amicus curiae.

2. By the Act of June 25, 1948, c. 645, 62 Stat. 758, Congress legislated concerning "[o]ffenses committed within Indian country." In pertinent part, the statute provides:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, . . . arson, . . . within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153 (1970 ed.) (emphasis added)

By the same Act, c. 645, 62 Stat. 757, Congress defined "Indian country" as follows:

"Except as otherwise provided in sections 1154 and 1156 of this title [which sections are not relevant here], the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151 (1976 ed.)

Under 25 U.S.C. § 1321(a) the federal jurisdiction over crimes committed in Indian country situated within a State may be "assumed" by that State, "with the consent of the Indian tribe occupying the particular Indian country . . . which could be affected by such assumption . . . ."

"on or about the sixteenth day of April, 1977, in Indian Township, County of Washington and State of Maine . . . did start, cause, or maintain a fire on the property of another, to wit; Indian Township Elementary School, situated in Peter Dana Point, so-called, in said Indian Township, the property of the Passamaquoddy Indian Tribe with the intent to damage or destroy property thereon." Each defendant pleaded not guilty, and the indictments were consolidated for trial before a jury. Evidence presented at trial as part of the State's case indicated that each defendant was an Indian and that each had committed the crime charged on the "reservation" in Maine inhabited by Indians bearing the name "Passamaquoddy Tribe." When the State concluded its case in chief, defendants contended that the indictments should be dismissed because the Court lacked jurisdiction of the subject-matter. By agreement, consideration of the issue was postponed until after the case had been submitted to the jury.

After the jury found the defendants guilty as charged, each defendant filed a motion in arrest of judgment asking dismissal for lack of subject-matter jurisdiction. Each motion claimed that defendant was a Passamaquoddy Indian, that the offense of arson charged against him was a crime listed in 18 U.S.C. § 1153, and that since it had been committed within "Indian country" as defined in 18 U.S.C. § 1151, the offense lay within the exclusive federal jurisdiction announced by Section 1153.[3]

Evidence presented at the hearing on the motions showed that each defendant was a Passamaquoddy Indian by descent and heritage, listed as a member of the "Passamaquoddy Tribe" on its rolls, and that the reservation in question at Peter Dana Point was inhabited by Indians of the "Passamaquoddy Tribe." The Justice presiding at the hearing found that "both of these defendants are indeed Indians." He concluded, however, that the Superior Court had jurisdiction of the subject-matter and, accordingly, denied each motion in arrest of judgment.

The rationale of this ruling, as explained in the opinion written by the presiding Justice, was: (1) dicta from this Court in 19th century cases

"suggest . . . that there is no [I]ndian country within the State of Maine . . .";

(2) express limiting language in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975), indicates that that decision does not require abandonment of the long-established and uniform practice of the Maine authorities as based on the prevailing belief that there has never been Indian country in this State; and (3) the record before the Superior Court sufficiently established that defendants committed the crime within the territorial boundaries of the State and thus proved the Superior Court's subject-matter jurisdiction.

Each defendant has appealed from the judgment of conviction entered against him and asserts as the only issue on appeal the jurisdictional question. As earlier indicated, we sustain the appeals, concluding that the presiding Justice erroneously assessed federal law, and more particularly the bearing of *Passamaquoddy v. Morton, supra*, on the matters, both factual and legal, that affect the determination whether the crime of arson was committed by these defendants in "Indian country."

2.

Taken in its narrowest decisional scope, *Passamaquoddy v. Morton* holds that the federal government's duty to act as the guardian of Indian tribes, as more particularly made a *trust* responsibility by the Indian Trade and Intercourse Act of 1790, 1 Stat. 137, now 25 U.S.C. § 177, extends to *every bona fide tribe of Indians*, even if any such tribe has never been specifically recognized as a tribe by the federal government and, absent such specific federal recognition, may have always submitted to the guardianship and protection of a State. *Passamaquoddy v. Morton* establishes at

**3.** See n. 2, *supra*.

least this much *as law,* though it may not have finally resolved the mixed factual and legal question whether the Maine Indians who bear the name "Passamaquoddy Tribe" constitute a bona fide tribe of Indians. See *Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, n. 3 (1st Cir. 1979).

In deciding *Passamaquoddy v. Morton,* the Court of Appeals for the First Circuit referred specifically to *State v. Newell,* 84 Me. 465, 24 A. 943 (1892), and to the reasoning underlying the dictum in that case (referred to by the presiding Justice here) denying the existence of "Indian country" in Maine. Insofar as the dictum in *Newell* rested on the factual considerations that the Passamaquoddies'

"power to make war or peace, and the like, had vanished, and the political and civil rights of its members were enforced only in the courts of the State",

the First Circuit pointed out that

"no federal cases hold that the test of tribal existence for purposes of the [Indian Trade and Intercourse] Act turns on whether a given tribe has retained sovereignty in this absolute sense." *Passamaquoddy v. Morton, supra,* at 378, n. 9.

Moreover, as to the remark in *Newell* that the federal government had never specifically recognized the Passamaquoddies to be a tribe of Indians, the First Circuit stressed that *if* the Passamaquoddies had always been a bona fide tribe of Indians federal recognition was not a "sine qua non" of the federal government's fiduciary responsibility to protect the "title" rights of the tribe in its lands. In addition, neither the status of the Passamaquoddies as a bona fide Indian tribe nor the federal government's role as fiduciary would have been terminated merely because the federal government had failed to make a response to *State v. Newell* disputing the view advanced in that case. *Passamaquoddy v. Morton, supra,* at 380.

The discussion that follows will show why we have concluded that the presiding Justice failed to accord the above-described aspects of the decision in *Passamaquoddy v. Morton* their full bearing on the factual and legal issues involved in the determination of the status of the area in question as "Indian country."

### 3.

Arguing in support of the Superior Court's subject-matter jurisdiction, the State first points to the fact that the term "Indian country" initially appeared, undefined, in the various Indian Trade and Intercourse Acts enacted by Congress in the period from 1790 until 1834. The State then presents an historical survey and review not only of pre-federal Indian policies of the British and the Continental Congress from which the Indian Trade and Intercourse Acts evolved but also of long-standing federal legislative, executive and administrative statements bearing on federal jurisdiction over the Indians generally and the Maine Indians in particular. Relying on this approach, the State takes the same position as to the meaning of the term "Indian country" appearing in 18 U.S.C. § 1151 that it sought, unsuccessfully, to have the First Circuit adopt regarding the meaning of "any . . . tribe of Indians" as used in the successive Indian Trade and Intercourse Acts. The State contends that even if the Passamaquoddies may always have been a bona fide tribe of Indians they had never been specifically recognized and dealt with by the federal government as constituting a tribe. Hence, they cannot be taken to be the kind of tribe contemplated by the mention of the "Indian Tribes" in Article I, § 8 of the federal Constitution, or by the language "any . . . tribe of Indians" used in the various Indian Trade and Intercourse Acts, and therefore the land they occupied in Maine could not have been thought to be "Indian country" within the meaning of the Indian Trade and Intercourse Acts enacted prior to 1834.

From this it follows, argues the State, that such land in Maine could never have been regarded by the Congress as being "Indian country" during the period from 1834 to 1948. The State assigns two reasons for this conclusion. First, in its comprehensive revision in 1834 of the Indian Trade and Intercourse Act, 4 Stat. 729, Con-

gress defined "Indian country" in metes and bounds terms which unquestionably established that there was no Indian country in Massachusetts and Maine (or in other major parts of the land east of the Mississippi River). Second, thereafter until 1948, the term "Indian country" had the meaning assigned it by the case of *Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877). *Bates v. Clark* did two things: (1) it clarified the meaning of Congress' 1834 definition of "Indian country" in a manner that excluded from the term's reach all land within the borders of any State; and (2) it announced a general principle which continued viable thereafter, see *Ex parte Crow Dog*, 109 U.S. 556, 561, 3 S.Ct. 396, 27 L.Ed. 1030 (1883); *Donnelly v. United States*, 228 U.S. 243, 269, 33 S.Ct. 449, 57 L.Ed. 820 (1913), that

"Congress . . . and the judges who administered . . . [various other] laws [enacted after 1834], must have found in the definition of Indian country, in the act of 1834, such an adaptability to the altered circumstances of what was then Indian country as to enable them to ascertain what it was at any time since then." *Bates v. Clark, supra*, at 207.

From *Bates v. Clark* until 1948, although in the meantime the Supreme Court of the United States had decided that it was within the power of Congress to establish the existence of "Indian country" within a State, *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), Congress never exercised its power, the State maintains, in such manner as to make land in the State of Maine "Indian country."

We have taken pains to set forth in detail the State's approach to the historical development of the term "Indian country" prior to 1948 to make clear that we have given it careful consideration in arriving at our decision. Even were we to assume the entire accuracy of the State's historical analysis,[4] we conclude that it would give us scant, if any, guidance to the meaning of "Indian country" as that term was ultimately defined in the comprehensive statutory revision made by Congress in 1948. We regard the 1948 enactment as virtually a new undertaking by Congress which, as stated in the Reviser's Note to Section 1151, sought to

"consolidate . . . numerous conflicting and inconsistent provisions of law into a concise statement of the applicable law"

by enunciating an expanded definition of "Indian country"

"based on [the] latest construction of the term by the United States Supreme Court . . . ."

4.

There can be little doubt that the 1948 "consolidation" significantly expanded the scope of the definition of "Indian country." See *United States v. John*, 437 U.S. 634, 649 n. 18, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978). Each of the five cases listed by the Reviser's Note as a source for the definition represented a step beyond the term's traditional meaning, and at least one of them provided the basis for further expansion by Congress.[5] Most significant of the five, for

---

4. The amicus curiae brief of the United States disputes the accuracy of the State's analysis in some respects.

5. Two of these cases, *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913) and *Kills Plenty v. United States*, 133 F.2d 292, *cert. denied*, 319 U.S. 759, 63 S.Ct. 1172, 87 L.Ed. 1711 (1943), relate to that part of the definition, designated (a), which states that "Indian country" includes

". . . land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including

rights-of-way running through the reservation."

*Donnelly* and *Kills Plenty* settled propositions about which previously there had been doubt; whether under prior conceptions of "Indian country" land would be included if it had never been the aboriginal land of any Indian tribe or is land actually in the possession or occupancy of a person not an Indian. The propositions thus settled are embodied as part (a) of the 1948 definition, as including *any* land within a reservation regardless of whether or not it was aboriginally occupied by an Indian tribe or whether or not it is in the actual possession or occupancy of an Indian, so long as the land is situated "within the limits of any Indian reser-

purposes of this case, is *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), the decision which not only formulated the "dependent Indian community" language incorporated by Congress verbatim in Section 1151(b) but also held it to be a correct statement of the essence of the federal power over Indians.

*Sandoval*, of course, decided a particular case, holding constitutional a statute which designated as Indian country "all lands now owned or occupied by the Pueblo Indians" situated within the sovereign State of New Mexico. By acting in this manner Congress had sought to bring the Pueblo lands within the coverage of other statutes applicable in Indian country. Attacking the constitutionality of this approach by Congress, New Mexico maintained that Congress lacked power over the Pueblo Indians and their lands situated in a sovereign State, even if it be assumed that the Pueblos were a tribe of Indians,[6] on the grounds (among others) that: (1)

> "[t]he lands of the Pueblo Indians are . . . . held by them in fee simple, segregated from the public domain, free from all conditions . . ."

and, therefore, the lands "are not, and never have been, held in trust by the Federal Government . . . ." *id.* at 33, 34 S.Ct. 1 and (2) no other characteristics of the Pueblo Indians and their lands exist to support as rational a finding that the Pueblo Indians presently are, or have ever been, wards of the federal government so as to fall within the

> "plenary authority arising out of the Nation's guardianship of the Indians as an alien but dependent people." *Id.* at 34, 34 S.Ct. 1.

The Court provided a twofold rebuttal. First, it summarized in a single sentence the foundational legal principle defining the general scope of Congressional power over Indian communities of a "tribal" nature,[7] a power conceived to have been conferred because necessary to the full effectuation of the federal government's duty to the Indians as the wards of the nation. The Court said:

> "Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but . . . the United States as a superior and civilized nation [has] the power and the duty of

vation under the jurisdiction of the United States government . . . ." See also *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); H.R.Rep.No. 152, 79th Cong., 1st Sess. 1945, at A86.

*United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), another case mentioned in the Reviser's Note, has relevance to part (c) of the 1948 definition:

> "[A]ll Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

The decision in *Pelican* was that such an allotment which is within a reservation is Indian country. The Reviser's Note explains that *Pelican* was thought to be adequate authority for giving part (c) of the 1948 definition the expanded scope of including as Indian country *all* such allotments even if not within a reservation.

The remaining two cases listed in the Reviser's Note, *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913) and *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) relate to the issue before us since their subject matter bears upon part (b) of the 1948 definition of "Indian country." *Sandoval* is more important than *McGowan* to

show the expanded nature of the 1948 definition, since *McGowan* was, basically, merely a further application of *Sandoval* as a legal precedent.

**6.** But see *United States v, Joseph*, 94 U.S. 614, 24 L.Ed. 295 (1876).

**7.** The Court in *Sandoval* seemed to use "communities" interchangeably with "tribes." Prior to *Sandoval*, in *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901), the Court had clarified that the concepts are intertwined, by defining a "tribe" of Indians as a "body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory."

It would appear, too, in light of *United States v. Antelope*, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), that to avoid "equal protection of the laws" difficulties Indians should be regarded as eligible for protective treatment by the federal government only insofar as the need of protection arises in connection with Indian "communities" having the "tribal" feature mentioned in *Montoya, supra*, of being "under one leadership or government."

exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State." *Id.* at 45, 46, 34 S.Ct. at 5.

Second, this general principle as to Congressional power was applied to test the validity of the *particular* exercise of power by Congress in the circumstances then before the Court. The Court concluded that the "power . . . of exercising a fostering care and protection over all dependent Indian communities" had been properly asserted; Congress had not acted "arbitrarily" in treating the Pueblos as a distinctly Indian community having a status of dependency "requiring the guardianship and protection of the United States . . . ." *Id.* at 46, 34 S.Ct. at 6. In support of this conclusion the *Sandoval* Court pointed to particular characteristics of the Pueblo Indians, "their Indian lineage, isolated and communal life, primitive customs and limited civilization", the very characteristics that had induced the "legislative and executive branches" of the federal government to deal with the Pueblo Indians over a period of many years as "dependent." *Id.* at 47, 34 S.Ct. 1, 6.

The State of Maine would have us give a restricted interpretation to the phrase "dependent Indian communities" which *Sandoval* mentioned in describing a general power of Congress and which Congress itself in 1948 adopted verbatim in Section 1151(b) to identify the objects toward which Congress was exercising precisely the power that *Sandoval* had described. The State urges us to read into "dependent Indian communities" a limitation similar to that previously urged by it, unsuccessfully, in *Passamaquoddy v. Morton, supra,* in regard to the interpretation of the phrase involved there, "any . . . tribe of Indians"—namely, the limitation making *specific* federal recognition a *sine qua non* of "dependency" status, as it had been claimed in *Passamaquoddy v. Morton* to be a *sine qua non* of "tribal" status.

It is true that the Court in *Sandoval* mentioned a prior "uniform course of action" by the federal government recognizing, and dealing with, the Pueblo Indians as "dependent", and that the very statute under attack was directed specifically to the Pueblo Indians and their lands. We cannot agree, however, that when Congress in 1948 spoke *generally* of "dependent Indian communities" as the object of its exercise of power, its intendment was to incorporate *particular* factors which happened to be present in *Sandoval* as indispensable elements of the existence of a "dependent Indian community."

In this regard, we reason as did the First Circuit Court of Appeals in *Passamaquoddy v. Morton, supra.* Congress has powers as to Indians that it may choose to exercise by acting either specifically or generally. By acting, in 1948, as to all "dependent Indian communities" situated anywhere in the United States, Congress acted *generally* to afford to each and every Indian community under its guardianship, and therefore dependent upon it, the protection that certain enumerated crimes committed within any such Indian community would be controlled by federal, instead of State, jurisdiction. In similar manner, Congress had acted *generally* as to "any . . . tribe of Indians" when, by enacting the successive Indian Trade and Intercourse Acts, it subjected "any . . . tribe of Indians" to its wardship, to be given the protection that Congress would be a special fiduciary guardian of the Indian lands.

Moreover, when we analyze more deeply the *Sandoval* Court's conception of the source of the comprehensive power it attributed to Congress to act by virtue of, and towards, the "dependency" status of Indians anywhere in the United States, we recognize that "dependency" as there involved encompassed the "land-dependency" status which was the object of the Indian Trade and Intercourse Acts and the focus of *Passamaquoddy v. Morton, supra.*

In *Sandoval* the Court made plain that the "dependency" status of Indians, as at least one cornerstone of Congressional pow-

er over Indians, was directly linked to the power the United States must be conceived to have simply because in its original, and continuing, contact and confrontation with Indians the United States is the "superior and civilized nation" and therefore must exercise "a fostering care and protection" over the Indians. *Id.* 231 U.S. at 46, 34 S.Ct. 1.

Having made this pronouncement, the Court in *Sandoval* immediately buttressed it with a quotation from *United States v. Kagama*, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886):

> "The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

By such reliance on *Kagama* the Court in *Sandoval* clarified that it conceived the antecedent dependency status of the Indian tribes to be the source, too, of the power Congress exercised in enacting the Major Crimes Act of 1885, which *Kagama* had sustained as constitutional, and which Congress exercised again in 1948 when in express terms it made dependency, comprehensively, a factor identifying the "Indian country" where Congress asserted exclusive federal jurisdiction over certain enumerated "major" crimes committed there by Indians.

We turn, then, to *Kagama* for further enlightenment as to the nature of this "dependency" status of Indians that was the originating source of the power of Congress to enact the Major Crimes Act of 1885 and which ultimately in 1948 became an expressly stated criterion identifying objects of Congress' exercise of that power.

Among the insights *Kagama* provides is this:

> "Following the policy of the European governments in the discovery of America towards the Indians who were found here, the colonies before the Revolution and the States and the United States since, *have recognized in the Indians a possessory right to the soil over which they roamed and hunted and established occasional villages. But they asserted an ultimate title in the land itself, by which the Indian tribes were forbidden to sell or transfer it to other nations or peoples without the consent of this paramount authority.*" *Id.* at 381, 6 S.Ct. at 1112. (emphasis added)

*Kagama* then refers to this *enforced subordination* of the Indian tribes' title to their lands into a mere right of occupancy, so-called "Indian title", as a primary basis for the pronouncement in *The Cherokee Nation v. The State of Georgia*, 5 Pet. (30 U.S.) 1, 8 L.Ed. 25 (1831) and *Worcester v. The State of Georgia*, 6 Pet. (31 U.S.) 515, 8 L.Ed. 483 (1832), that the Indian tribes are the "'wards of the nation,' 'pupils,' . . . local *dependent* communities." *Id.* at 382, 6 S.Ct. at 1113. (emphasis added)

Subsequent analysis in *Kagama* elaborates the significance of this denigration of the land titles of the Indian tribes as a foundational factor giving rise to their status of dependency and the corresponding power, and duty, of the United States to protect them by the assertion of exclusive federal jurisdiction over various crimes committed by Indians. As already stated, *Kagama* resolved the question whether the Constitution empowered Congress to exclude the jurisdiction of a sovereign State, in the exercise of its police power, over the commission of the crime of murder by one Indian against another on Indian reservation lands located entirely within the limits of the State. Acknowledging that it

> "would be a very strained construction of . . . [the commerce clause, Article I, § 8] . . ."

to view it as the source of congressional power over the

> "common-law crimes of murder, manslaughter, arson, burglary, larceny, and the like, *without any reference to their relation to any kind of commerce . . .*"

*id.* at 378, 379, 6 S.Ct. at 1111 (emphasis added),

the Court proceeded to locate the source of such congressional power in "the manner in which the Indian tribes are introduced into . . . [the commerce] clause . . . ." *Id.* at 379, 6 S.Ct. at 1111. As to this, *Kagama* observed:

> "The relation of the Indian tribes living within the borders of the United States, both before and since the Revolution, to the people of the United States has always been an anomalous one and of a complex character." *Id.* at 381, 6 S.Ct. at 1112.

Then, as a cardinal element in its delineation of the relationship, the Court adverted to the subordinated nature of "Indian title" as a primary factor underlying the conception in *Cherokee Nation* and *Worcester, supra*, that the Indian tribes are "wards" of the United States.[8]

*Kagama* makes plain, then, that had the Court in *Sandoval* been able to find that the title of the Pueblo Indians to the lands they occupied in New Mexico had been subordinated into a mere "Indian title", for the protection of which the Pueblos were in need of the guardianship of the federal government as the only government capable of affording adequate protection, the Court would have found the "dependent" status of the Pueblo Indians to have been sufficiently established, without more. See also *People ex rel. Cusick v. Daly*, 212 N.Y. 183, 105 N.E. 1048, 1049 (1914). That was not the situation in *Sandoval*, however,[9] and the Court was therefore obliged to seek other characteristics of the Pueblos that showed their condition to be one of dependency.

Here, *Passamaquoddy v. Morton, supra*, comes into play with cogent force. It concentrates precisely on the point that the first United States Congress in 1790 acknowledged the dependency on the federal government of any tribe of Indians inhabit-

---

8. In recent years, in *Oneida Indian Nation of New York v. County of Oneida, New York*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), the Court described the nature of "Indian title" in the same terms of subordination as used in *Kagama*, and further delineated the powers of the federal government in regard to the "Indian title" of the Indian tribes as follows:

> "Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. . . . The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, . . . . . This has remained the policy of the United States to this day." *Id.* at 667, 668, 94 S.Ct. at 777.

The Court made an additional point in *Oneida* regarding "Indian title" that is highly significant to an undertaking like that in which we are presently engaged: determining the relation of any of the original 13 States to matters that arise out of the federal government's role as the guardian of "Indian title." The Court observed:

> "The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State, *Fletcher v. Peck*, [10 U.S. 87,] 6 Cranch 87, [3 L.Ed. 162] (1810). *But this reality did not alter the doctrine that federal law, . . . protected Indian occupancy and that its termination was exclusively the province of federal law.*" *Id.* at 670, 94 S.Ct. at 779. (emphasis added)

9. As we have already mentioned, the State of New Mexico had strongly argued in *Sandoval* that the Pueblo Indians owned their lands "in fee simple, segregated from the public domain, free from all conditions" and, accordingly, no trust relation with the federal government had ever arisen in regard to the Pueblo lands. *Sandoval*, 231 U.S. at 33, 34 S.Ct. 1. Apparently, the Court believed that it must acknowledge this contention as basically correct, *id.* at 48, 34 S.Ct. 1, and thus proceeded to find other grounds supporting the determination that the Pueblo Indians were in a status of dependency.

Subsequently, in *United States v. Candelaria*, 271 U.S. 432, 440–442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), the Court seems to have recognized that had it more scrupulously investigated the status of the Pueblos' title to their lands under both the Spanish and Mexican law, it could have found "dependency" in *Sandoval* on the basis of a trust relationship regarding the Pueblo lands.

ing lands to which it had "Indian title", namely, a right of occupancy, and acted to give any such tribe protection by imposing on the federal government special trust responsibility to protect that "Indian title." *Passamaquoddy v. Morton* is central to our analysis because of its holdings that since Congress had thus acted *generally* as to Indian tribes (1) Congress recognized, and protected, each and every Indian tribe as being in a *dependent* status by virtue of its "Indian title", its rights to continue in occupancy of its lands; (2) it is not a *sine qua non* of the existence of such dependency on the United States that the federal government must have *otherwise specifically* recognized "tribal" and "dependency" status; and (3) any such tribe's dependency on the federal government, as an originally arising or subsequently continuing status, is not precluded or terminated by the fact that, in the absence of any such *other specific* federal recognition, the tribe had submitted itself over a long period of time to a sovereign State's protective guardianship. See also *Bottomly v. Passamaquoddy, supra*, at 1064–1065.

In enacting the various Indian Trade and Intercourse Acts, Congress had exercised its plenary powers over Indians as conferred by the federal Constitution. For this reason, the decision in *Passamaquoddy v. Morton* holding that those statutes applied to *each and every bona fide tribe*, regardless of whether otherwise recognized as a tribal entity dependent upon the United States, and that those statutes represented Congress' exercise of its constitutional power regarding the "Indian Tribes" to the fullest, *id.* at 377, must be taken to have held that the powers conferred by the Constitution extended to *each and every bona fide tribe of Indians*. Were it otherwise, Congress would have acted in excess of its constitutional power in enacting the Indian Trade and Intercourse Acts with the breadth of coverage *Passamaquoddy v. Morton* interpreted them to have.

The State of Maine seeks to convince us that by conceiving so broadly the "Indian Tribes" over which the Constitution gave powers to Congress, *Passamaquoddy v.*

*Morton* was wrongly decided. The State cites *Moor v. Veazie*, 32 Me. 343 (1850), sustained by the Supreme Court of the United States in *Veazie et al. v. Moor*, 14 How. (55 U.S.) 568, 14 L.Ed. 545 (1852). Relying on a stipulation entered into by the parties, this Court in *Moor v. Veazie* assumed that the "Indian Tribes" referred to in Article I, § 8 of the Constitution were not intended to include

"those small tribes or remnants of tribes yet denominated tribes, which had before that time and have ever since continued to be under the control and guardianship of a State . . . ." *Id.* 32 Me. at 366.

The State intimates that by sustaining *Moor v. Veazie* the Supreme Court of the United States approved the view that the Indians in Maine, even if they may have been bona fide Indian tribes, were not placed under federal power and protection.

This intimation by the State is erroneous. The statement in *Moor v. Veazie* as to the kinds of Indian tribes encompassed by the Constitution's commerce clause was unnecessary to the actual decision of the case. In *Moor v. Veazie* only navigation, as one facet of commerce, was under consideration. This Court ruled that the plenary power of Congress over navigation extended only to such of a State's "interior waters" as can be navigated "for purposes of commerce with foreign nations, or among the several States." *Id.* 32 Me. at 366. Accordingly, since the navigation involved in *Moor v. Veazie* had been regulated by the State of Maine only as to

"that part of the [Penobscot] river, from which no vessel can proceed and pass out of the limits of the State", *id.* at 368,

such strictly local aspect of navigation was not within the plenary power of the federal government. It was merely this narrow decision, without regard to the view expressed by this Court concerning the kinds of "Indian Tribes" comprehended within Article I, § 8, that the Supreme Court of the United States sustained.

■ We disagree, then, with the State's contention that *Passamaquoddy v. Morton*

was wrongly decided. In our opinion the First Circuit correctly conceived the reach of the "Indian Tribes" over which the federal Constitution reposed plenary power in Congress. The First Circuit's view is supported by comments expressed by James Madison in *The Federalist Papers*, No. 42:

> "The regulation of commerce with the Indian tribes is very properly unfettered from two limitations in the Articles of Confederation, which render the provision obscure and contradictory. The power is there restrained to Indians, not members of any of the States, and is not to violate or infringe the legislative right of any State within its own limits. What description of Indians are to be deemed members of a State is not yet settled, and has been a question of frequent perplexity and contention in the federal councils. And how the trade with Indians, though not members of a State, yet residing within its legislative jurisdiction can be regulated by an external authority, without so far intruding on the internal rights of legislation, is absolutely incomprehensible. This is not the only case in which the Articles of Confederation have inconsiderately endeavored to accomplish impossibilities; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States; to subvert a mathematical axiom by taking away a part and letting the whole remain." *Id.* at 268, 269.

The opinion for the Court in *Worcester v. The State of Georgia, supra,* Chief Justice Marshall's fountainhead decision regarding the powers of Congress over Indian affairs, stresses the same point. The Court majority there stated that the Constitution had "discarded" the "shackles" imposed by the Articles of Confederation on the federal government's relation to the Indian tribes. 6 Pet. (31 U.S.) at 558, 559.

The view thus expressed in *Worcester v. The State of Georgia* was reaffirmed by a unanimous Court in *United States v. 43*

*Gallons of Whiskey, Etc.,* 93 U.S. 188, 194, 23 L.Ed. 846, (1876) in the following language:

> "Under the articles of confederation, the United States had the power of regulating the trade and managing all affairs with the Indians not members of any of the States; provided that the legislative right of a State within its own limits be not infringed or violated. Of necessity, these limitations rendered the power of no practical value. This was seen by the convention which framed the Constitution; and Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes,—a power as broad and as free from restrictions as that to regulate commerce with foreign nations. The only efficient way of dealing with the Indian tribes was to place them under the protection of the general government."

■ *Passamaquoddy v. Morton,* then, must be regarded as having correctly decided that the Indian Trade and Intercourse Acts applied to each and every bona fide tribe of Indians occupying lands, with rights to continue in occupancy of them, situated anywhere in the United States. By these Acts the *dependency of each such tribe* on the United States was recognized as in need of protection in the most primal aspect of the tribe's existence,[10] and protection was afforded by the United States' assuming genuine trust duties. The decision in *Passamaquoddy v. Morton* thus aligns with *Kagama,* and *Sandoval,* and with Congress' adoption in 1948 of the *Sandoval* concept of Indian "dependency" as a cornerstone of that "Indian country" wherein federal "major crimes" jurisdiction attaches; and it thereby points towards the final element which may establish that exclusive federal jurisdiction has been asserted over the subject-matter of the case at bar.

---

**10.** In *Heckman v. United States*, 224 U.S. 413, 438, 32 S.Ct. 424, 432, 56 L.Ed. 820 (1912), the Court said:

> "If these Indians may be divested of their lands, they will be thrown back upon the Nation a pauperized, discontented and, possibly, belligerent people."

■ As we have already discussed, *Kagama* and *Sandoval* indicate that when an Indian tribal community has "Indian title", a right to occupy lands, which the federal government has undertaken to protect by assuming fiduciary responsibilities, the dependency status of the Indian community thus acknowledged and protected would be sufficient to establish "dependency" within the meaning of Section 1151(b). *Passamaquoddy v. Morton* adds the conception that by having *legislated generally* as to the Indian tribes in the Indian Trade and Intercourse Acts Congress acknowledged the dependent status, and brought under the federal government's fiduciary guardianship *each and every bona fide tribe of Indians* which was *then* inhabiting lands to which it had "Indian title", that is, a right to continue to occupy. Taken in tandem, then, the decisions establish that "Indian country", defined to encompass land anywhere in the United States inhabited by a "dependent Indian communit[y]", will include the land in Maine now occupied by the Passamaquoddy Indians *if*, as a bona fide tribe of Indians, the Passamaquoddies inhabited that land and had "Indian title" to it in 1790 when the Indian Trade and Intercourse Act became law, and *if* the status of the Passamaquoddies and the nature of their occupancy of the land was the same when the instant crime was committed on it.

■ The presiding Justice committed error by failing to recognize the extent of the impact of *Passamaquoddy v. Morton* on the case at bar. More particularly, the Justice erred in failing to realize that he could not properly decide the question of subject-matter jurisdiction without receiving evidence relating to the questions, mixed ones of fact and law, (1) whether, when the Indian Trade and Intercourse Act became law, the Passamaquoddy Indians were a bona fide tribe and were then occupying the land involved here, with "Indian title" rights to it and (2) whether the same tribal and occupancy status existed at the time the instant crime was committed. Only after having made the factual findings required by such inquiry, and having properly applied to the facts the relevant legal concepts, could the presiding Justice decide the jurisdictional issue correctly.

Accordingly, the appeal of each defendant must be sustained and the case remanded to the Superior Court for further proceedings.

5.

The discussion that follows is designed to guide the proceedings of the Superior Court on remand.

Our analysis has shown that resolution of the question of federal, rather than State, jurisdiction of the case will turn on whether, at relevant times, the "Passamaquoddy Tribe" was a bona fide tribe inhabiting the land involved here, with "Indian title" to it, namely, the right to occupy it. Only if the "Tribe", and its occupancy, were *not* such in 1790 when Congress, by enacting the Indian Trade and Intercourse Act, acknowledged "any . . . tribe of Indians" as a ward of the United States and as specially protected in its "Indian title" or, alternatively, if the "Tribe" and its occupancy *then* were such but that status was subsequently lost, may the State of Maine assert jurisdiction over a Passamaquoddy Indian accused of committing arson at Peter Dana Point.

Pursuant to 17–A M.R.S.A. § 5, then, the State of Maine must come forward with evidence before the presiding Justice, acting without a jury, sufficient to meet the ultimate burden of establishing beyond a reasonable doubt either (1) that in 1790 the "Passamaquoddy Tribe" was *not* a bona fide tribe occupying the land in question with "Indian title" to it; or, in any event (2) that on April 16, 1977, when the instant crime was committed, the Passamaquoddy Indians had ceased to be a bona fide tribe, in consequence of which they had then ceased to be a "dependent Indian community."

It should be noted that should the State fail to defeat federal jurisdiction on the basis of the 1790 status of the Passamaquoddy Indians, the State's pursuit of the alternative course of seeking to negate their tribal status on April 16, 1977 will pose serious practical difficulties.

First, if the State fails to exclude as reasonable that the 1790 legislation had made the Passamaquoddies specially dependent on the United States, proof that the federal government did nothing further to recognize, or protect, the Passamaquoddy Indians as wards of the federal government, in consequence of which the Passamaquoddies submitted themselves to the protective guardianship of the State of Maine, would *not* foreclose as reasonable that on April 16, 1977 the "Passamaquoddy Tribe" was a dependent ward of the federal government. *Passamaquoddy v. Morton, supra*, at 378, 380.

Second, the State of Maine stipulated, in the federal proceedings which culminated in the *Passamaquoddy v. Morton* decision, that the "Passamaquoddy Tribe" was then, and at all prior relevant times had been, a "tribe . . . in the racial and cultural sense", 388 F.Supp. 649 at 651, 652. Whatever underlying facts led the State so to stipulate would be facts tending to make it highly unlikely that in the brief period of two years the "tribal" status of the Passamaquoddies had terminated. It is to be borne in mind as well that this heavy factual burden must be carried within a legal context that requires acts of deliberate choice by all, or nearly all, members of a tribe before the existing tribal status may be said to have disappeared through abandonment. See *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 587 (1st Cir. 1979); *Bottomly v. Passamaquoddy, supra*, at 1066.

Lastly, pursuant to 44 U.S.C. § 1507, we take judicial notice, as must the Justice presiding in the Superior Court, that in the Federal Register, Vol. 44, No. 26—Tuesday, February 6, 1979, at 7235, 7236, the following "notice" appeared:

"January 31, 1979.

"This notice is published in exercise of authority delegated by the Assistant Secretary—Indian Affairs under 5 U.S.C. 2 and 9 [25 U.S.C. 2 and 9]; and 230 DM 1 and 2.

"Notice is hereby given in accordance with 25 CFR 54.6(b) by the Bureau of Indian Affairs of the tribal entities that have a government-to-government relationship with the United States. The United States recognizes its trust responsibility to these Indian entities and, therefore, acknowledges their eligibility for programs administered by the Bureau of Indian Affairs."

The notice designated the "Passamaquoddy Tribe of Maine" as one such recognized "tribal entity."

■ In view of the traditional deference of the judiciary to federal executive recognition of Indian tribal status, see *Passamaquoddy v. Morton, supra*, at 377; *Mashpee Tribe v. New Seabury Corp., supra*, at 582, the federal recognition of the "Passamaquoddy Tribe" as a "tribal entity" to which the United States has "trust responsibility" will provide strong evidence that such tribal status in fact existed on April 16, 1977. It would appear that the existence, or termination, of an Indian tribe comes about gradually over time, not overnight. Hence, the federal recognition of the tribal status of the "Passamaquoddy Tribe" as existing on January 31, 1979, coupled with the above-mentioned stipulation, would make proof beyond a reasonable doubt that the tribal status of the "Passamaquoddy Tribe" did *not* exist in the interim period between 1975 and January 31, 1979 (that is, on April 16, 1977, the date of the instant crime) a high hurdle indeed for the State to clear.

We turn from the factual aspects of the proceedings on remand to discuss the legal concepts which are applicable. Regarding the legal meaning of "bona fide tribe", the presiding Justice is to be guided by the concepts utilized by the United States District Court, and analyzed by the Court of Appeals for the First Circuit, in the consolidated cases identified as *Mashpee Tribe v. New Seabury Corp., supra*. Although two of the three Appeals Court Judges who sat in *Mashpee* were unwilling to decide that the legal concepts there used by the trial court were accurate in all technical respects or were adequate to fit all cases and circumstances in which Indian tribal status might be in question, those concepts provide a sufficiently good working model for the

presiding Justice to use on remand here, with such adaptations as he may think appropriate, to determine correctly the legal meaning of "bona fide Indian tribe." [11]

The entry is:

Appeal of each defendant sustained; case remanded to the Superior Court for further proceedings in accordance with the opinion herein.

---

11. We add a final footnote to stress what the entirety of this opinion should have made obvious. We are concerned, here, *only* with the question of whether there may be federal jurisdiction over certain major crimes committed by an Indian on particular land in Maine which now is, and for a long time has been, inhabited by the Passamaquoddy Tribe. As to this land, no private third party claims of ownership, or rights of occupancy, are involved. Thus, in deciding as we have, we intimate no opinion upon the merits of the dispute in which the Passamaquoddy Tribe has been, and still is, engaged with the federal government and the State of Maine in regard to other Maine lands which now are, and for a long time have been, occupied by private third persons who claim title, or other rights, in those lands.