UNITED STATES of America, Appellee,

v.

Leonard LEVESQUE, a/k/a Jason Levesque, and Raynard Levesque, Defendants, Appellants.

No. 80–1749.

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1982.

Decided June 22, 1982.

Joseph L. Ferris, Ellsworth, Maine by appointment of the Court, with whom Libhart, Ferris, Dearborn, Willey & Ferm, Ellsworth, Maine, was on brief, for appellant Raynard Levesque.

Charles E. Gilbert, III, Bangor, Maine by appointment of the Court, and Vafiades, Brountas & Kominsky, Bangor, Maine, on brief for appellant Leonard Levesque.

Jay P. McCloskey, Asst. U. S. Atty., Bangor, Maine, with whom Richard S. Cohen, U. S. Atty., Portland, Maine, was on brief, for appellee.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The appellants, Leonard and Raynard Levesque, are Passamaquoddy Indians. Because of their participation in certain violent events arising from a drunken brawl, they were prosecuted and convicted after a jury trial in the United States District Court for the District of Maine of having assaulted one Allen Dorn resulting in serious bodily injury. 18 U.S.C. § 1153. Federal prosecution was grounded on the theory, as alleged in the indictment, that the crime occurred "within the Indian country, to wit, the Passamaquoddy Indian Reservation, Peter Dana Point, Indian Township, Washington County, a dependent Indian community, in the District of Maine." Section 1153 of 18 U.S.C. provides that an Indian who commits an "assault resulting in serious bodily injury within the Indian

country" is subject to the jurisdiction of the United States. *See United States v. John,* 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1977).[1]

On appeal from their convictions, the Levesques assert that the evidence was insufficient to establish that the offense was within "Indian country." They also raise other exceptions.

1. *Whether the Offense was within "Indian Country"*

The term "Indian country" is defined in 18 U.S.C. § 1151 as comprehending,

> (a) all land within the limits of any Indian Reservation under the jurisdiction of the United States Government ... (b) *all dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof ... (c) all Indian allotments. ...

(Emphasis supplied). The Peter Dana Point region where the alleged offense occurred is not a federal reservation nor is it an "Indian allotment." The government contends, however, that it is a "dependent Indian community" and is, for that reason, "Indian country." The court below charged the jury that, to convict, it must first determine that such was the case, and appellants now argue both that the evidence was insufficient to allow such a finding and that the court erred in presenting the issue to the jury rather than deciding it for itself.

Underlying defendants' contentions is the fact that the Passamaquoddy Tribe in Maine, of which defendants are members, unlike the Western Indians, has only recently been recognized as having any relationship with the federal government. Until the Passamaquoddies prevailed in litigation in the 1970's, *see Passamaquoddy v. Morton,*

---

1. Section 1153 of Title 18 provides in part that

   Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

528 F.2d 370 (1st Cir. 1975),[2] they were regarded as wards of the State of Maine, and their reservations in Maine—of which the locus of the crime here in question was a part—were state regulated. Thus for nearly 200 years, criminal jurisdiction over Passamaquoddies wherever located was exercised by the state. The present case arises in the aftermath of the *Morton* decision and following a formal determination by the federal Bureau of Indian Affairs published January 29, 1979, that the Passamaquoddy Tribe is a "tribal entity" having a government-to-government relationship with the United States.[3] 44 Fed.Reg. 7,235, 7,236 (1979).

We believe that federal jurisdiction was adequately demonstrated here.[4] Congress inserted the term "dependent Indian community" in the statutory definition of Indian country in 1948. The revisers of the 1948 Criminal Code noted that the definition was based on construction of the term in *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1937), following *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913). In *Sandoval*, the Supreme Court upheld Congress's power to enact criminal sanctions with respect to conduct occurring on lands owned communally by Pueblo Indians and held by them in fee simple, such lands being termed by the Court "dependent Indian communities." The phraseology in issue thus seems intended to afford federal criminal jurisdiction over crimes committed by Indians in communities which, while neither part of a federal reservation nor Indian "allotments," are both "Indian" in character and federally dependent.

Since 1948 the Eighth and Tenth Circuits have had occasion to construe the meaning of "dependent Indian community" as used in 18 U.S.C. § 1151. *United States v. South Dakota*, 665 F.2d 837 (8th Cir. 1981); *Weddel v. Meierhenry*, 636 F.2d 211 (8th Cir. 1980), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981); *United States v. Martine*, 442 F.2d 1022 (10th Cir. 1971). *See also United States v. Mound*, 477 F.Supp. 156 (D.S.D.1979). These courts have concluded that section 1151(b) mandates a functional inquiry into the nature of the community in which the crime occurred, the ultimate issue being whether the evidence shows that the area was established for the use, occupancy and protection of dependent Indians. Thus in *Martine*, sustaining federal jurisdiction over an offense on Navajo-owned land purchased with tribal funds from a corporate owner, the Tenth Circuit held that the district court properly took evidence on the nature of the area, the relationship of the inhabitants to Indian Tribes and to the federal government, and the established practice of government agencies towards the area. 442 F.2d at 1023.

The Eighth Circuit followed much the same approach in *United States v. South Dakota*. It found that a housing project operated and principally occupied by Indians was a dependent Indian community. The fact that a small number of non-Indians also lived at the project, that residents' children attended the local public schools, and that the project would cease whenever HUD funding ran out, were held not to prevent "dependent Indian community" status.

---

**2.** *See also State v. Dana*, 404 A.2d 551 (Me. 1979), *cert. denied*, 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980), dealing with the reverse side of the present coin: the question of possible state criminal jurisdiction over Peter Dana Point. A useful collection of articles on the unique legal issues relating to the Passamaquoddies appears in 31 Maine L.Rev. 1–213 (1979–80).

**3.** In the same published notice, the Bureau of Indian Affairs stated that the United States

recognized "its trust responsibilities to these Indian entities and, therefore, acknowledges their eligibility for programs administered by the Bureau of Indian Affairs."

**4.** We are advised that since this prosecution, the United States and the State of Maine have agreed that future criminal prosecutions will be undertaken by the State of Maine. The present proceeding may well, therefore, be something of an anomaly.

In the present case, the prosecution submitted largely unrebutted evidence on the three key factors identified in *Martine*, 442 F.2d at 1023. Concerning the first such factor, the nature of the area, it was shown that the assault occurred in front of a mobile home on a promontory called Peter Dana Point located within Indian Township. Except for 6,000 privately owned acres located elsewhere, it was testified that all of Indian Township belonged to the Passamaquoddy Indians, being part of the Passamaquoddy Indian Reservation. As to the second factor, the relationship of the inhabitants to Indian tribes, it was shown that 94 percent of the inhabitants of Indian Township were Passamaquoddy Indians, their status as such, for census purposes, having been approved by the Passamaquoddy Governor and Council. And finally, as to the relationship of the community with the federal government and the practice of government agencies, it was testified by John Meyers, Director of Indian Services, Bureau of Indian Affairs, that the Passamaquoddy Tribe now had the status of a federally recognized tribe. Citing the published notice mentioned above, Mr. Meyers said that a government-to-government relationship existed between the Passamaquoddy Tribe and the United States. He testified to various federal government programs involving the Tribe, including recent grants for tribal courts and law enforcement. From 1979–81, about $3 million had been furnished the Indians from federal sources. The State of Maine, according to Meyers, no longer funds the Tribe.

We think the above evidence, which was not substantially disputed, established prima facie that Peter Dana Point, where the crime occurred, was a "dependent Indian community" and hence "Indian country" within 18 U.S.C. § 1153.[5]

■ Appellant Leonard Levesque argues that, even so, the district court erred by sending to the jury the question whether the locus constituted a dependent Indian community. In this he may well be correct. This was not a case where there was a factual dispute over where the crime occurred. The only question was whether the government's unrebutted evidence about the nature of the area, the make-up of the population, and the community's relationship with the federal government, revealed a dependent Indian community. Whether the crime occurred in Indian country was thus a jurisdictional fact susceptible of determination without reference to any of the facts involved in determining defendants' guilt or innocence. *See United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1560, 23 L.Ed.2d 94 (1969).

But even assuming the court itself should have decided whether or not the locus was in Indian country, its error in submitting the issue to the jury does not, on this record, provide cause for reversal. Defendants did not, as was required, object to submitting the matter to the jury, nor were the jury instructions given based on an incorrect legal standard. Fed.R.Crim.P. 30. The undisputed evidence of record, moreover,

5. Citing to the scholarly opinion of Justice Wernick, writing for the Supreme Judicial Court of Maine, in *State v. Dana*, 404 A.2d 551 (1979), *cert. denied*, 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980), appellants argue that the prosecution could only establish "dependent Indian community" status by proving, as an original proposition, that the Passamaquoddy Indians were a bona fide tribe, that they inhabited the land they now occupy with "Indian Title" as of 1790, and that their status on the date of the crime was the same.

We disagree with appellants' arguments on this score. The Supreme Judicial Court's opinion addressed the heavy burden *the state* had if it were to establish *state* jurisdiction over Peter Dana Point in the face of the many tangible

indications of federal status. 404 A.2d at 562–63. The Maine court described the substantial indications as of 1979 (which included federal recognition, *supra*) that the Passamaquoddies were a tribe and of other matters tending to establish *federal* jurisdiction. *Id.* In the absence here of any significant evidence negativing tribal status or the existence of "Indian Title," we are satisfied that the United States established as part of its case-in-chief all that was jurisdictionally necessary even assuming this court were to accept as legally correct the formulation in *Dana*. We add that we express no opinion as to the correctness of the *Dana* formulation, in particular the requirement of "Indian Title," as we need not reach that question in order to decide the case.

adequately shows that the alleged crime occurred in a dependent Indian community. *See* note 5, *supra.* We therefore find neither plain error nor any such error of law as would lead us to vacate the convictions on the ground that section 1151 jurisdiction was lacking.

### 2. *Objections to Conduct of Trial*

■ Raynard Levesque took the stand in his own behalf and towards the conclusion of direct examination was asked by his own counsel whether he had been convicted of larceny in the tribal court in September. Raynard responded that he had been so convicted—of petty larceny. Raynard now argues that he volunteered this information so as not to appear to the jury to be attempting to hide his prior criminal record. He points to an earlier colloquy with the court[6] from which it might be inferred that the court had indicated at an unrecorded meeting in chambers that Raynard Levesque's criminal record, involving the larceny, would be allowed in should Raynard take the stand. Raynard contends that this ruling was error, since petty larceny is a misdemeanor which is not *crimen falsi* and

is therefore inadmissible under Fed.R.Evid. 609(a)(2).[7]

On this record, however, we are unable to reach the admissibility of the petty larceny conviction. It would be improper to penalize the government for evidence *the defense* introduced absent a clearer showing of governmental responsibility for it. Whatever Raynard's fears, the record reveals no inquiry as to the government's intentions to use the convictions, nor any suggestion by the prosecutor that he meant, or was likely to do so. The prosecutor never alluded to the conviction on cross-examination, and earlier, in the only recorded colloquy, *see* note 6, the judge said he did not know if the government proposed to try to impeach Raynard in this manner.

This circuit has been willing to review an advance ruling admitting prior convictions where the defendant reasonably relies upon the advance ruling to his detriment. *United States v. Kiendra,* 663 F.2d 349, 352 (1st Cir. 1981) (defendant elected not to testify after judge ruled prior convictions admissible). *See also United States v. Hickey,* 596 F.2d 1082, 1087 (1st Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979).

> THE COURT: I understand why you want to raise it now, yes. I will allow it. And you have an objection on the record.

**6.** Prior to the government's calling of its last witness, Mr. Ferris, Raynard Levesque's attorney, engaged in the following colloquy with the district court:

> MR. FERRIS: Your Honor, with respect to what I indicated in chambers, do you want me to put that objection on the record now?
> THE COURT: You mean as to the use of the criminal record of the defendant?
> MR. FERRIS: Yes.
> THE COURT: I don't think it's necessary at this point, because it hasn't been raised. Only when it is presented, I think—for all of us know, I don't know if you're going to put the defendant on the stand, *and I don't know if the government is going to try to impeach the defendant by using the criminal record.* [Emphasis supplied.]
> MR. FERRIS: Well, my present intention is to put the defendant on, and, based on the Court's ruling that it would allow evidence in of the tribal court of a larceny conviction [sic], I would want to bring that out on direct.
> THE COURT: All right.
> MR. FERRIS: That's the nature—
> THE COURT: Very well.
> MR. FERRIS: —of my objection.

**7.** While this circuit permitted a petty larceny conviction to be used for impeachment in *United States v. Brown,* 603 F.2d 1022 (1st Cir. 1979), the issue whether this conviction was admissible under Rule 609(a)(2), as a crime involving dishonesty or false statement, was not addressed. *See also United States v. Kiendra,* 663 F.2d 349 (1st Cir. 1981) (no question raised whether crimes of possession of stolen vehicle and receiving stolen goods were *crimen falsi* for Rule 609(a)(2) purposes; where admission is under Rule 609(a)(2) instead of 609(a)(1), balancing is not required). In *United States v. Grandmont,* 680 F.2d 867 (1st Cir. 1982), this court has just ruled on the analogous question of admissibility of robbery convictions under Rule 609(a)(2). Relying on the reasoning in *United States v. Smith,* 551 F.2d 348, 361-65 (D.C.Cir. 1976), we held that absent some showing that the crime was committed by fraudulent or deceitful means, "robbery per se is not a crime of dishonesty within the meaning of 609(a)(2)." *United States v. Grandmont,* 680 F.2d 867, 871.

But in such a case, the prosecutor's intention to use the questioned evidence if the accused took the stand was manifest. Here, to the contrary, the record provides no clue as to the prosecutor's intentions. For all that appears the government might have preferred to avoid sowing possible appellate error in what was an extremely strong case for it. This is not to say the prosecutor, had he been asked his intentions at the time Raynard was undergoing direct examination, would have been entitled to play cat and mouse. But he was not so asked,[8] and in the absence of any inquiry the defense proceeded at its own risk in volunteering the conviction.

We observe, in addition, that the record is devoid of details concerning the nature and extent of the court's purported off-the-record ruling, the character of the offense for which Raynard was convicted in Indian court, and the extent, if any, to which counsel advised the district court of the grounds for his objection. These omissions strengthen our belief that we cannot treat the question of the admissibility of the conviction as properly before us. We therefore reject Raynard Levesque's claim of error in this regard.

■ Leonard Levesque argues that the district court committed reversible error in permitting an individual who was supposed to serve as an alternate juror to act instead as a regular juror. The mix-up occurred as follows: After initial selection of the jury and two alternates, it was agreed to excuse juror no. 12 for cause, and the parties further agreed that the then first alternate juror would be moved onto the jury, the second alternate would become first alternate, and a third person, just selected, would be moved into the second alternate's seat. However, this third individual, instead of being seated as the second alternate, was somehow seated as juror no. 12, thus "jumping over" the more senior alternates. This deviation from the agreed-upon scenario apparently went undetected, and at the end of the trial, the individual who should have been the second alternate but had been sitting as juror no. 12, retired with the jury, and the two individuals who had been seated as alternates were discharged. Leonard Levesque now argues that it was reversible error for the person intended as second alternate to have served as a regular member of the panel, since her inclusion on the panel deprived appellant of the jury of his choice and violated Fed.R.Crim.P. 24(c).[9]

We see no basis for reversal. The procedure followed was, to be sure, erroneous under Rule 24(c). Moreover, it was not as the attorneys had agreed. But if, as Levesque argues, he was deprived of a juror to whom he had "a valued right," see United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971), it seems surprising that counsel thought so little of the fact as neither to note it, nor object to it. Had counsel done so, the matter could have been speedily rectified.

■ Not every violation of Rule 24 calls for reversal. Reversal is in order only where the irregularity affects substantial rights, Fed.R.Crim.P. 52. Moreover, defects of less than a fundamental nature will be overlooked if they were not called to the court's attention in a timely manner. See Fed.R.Crim.P. 51. Here, the person who served as twelfth juror had fully qualified to serve as a juror and would have been expected to do so had vacancies occurred in

---

8. The question should have been asked on the record but, of course, outside the hearing of the jury.

9. The Rule states as follows with respect to impanelling and to dismissing alternate jurors: The court may direct that not more than 6 jurors in addition to the regular jury may be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

the regular panel. This was not a case where an additional person was allowed to sit in on jury deliberations, thus destroying the sanctity of the jury. *United States v. Beasley*, 464 F.2d 468, 470 (10th Cir. 1972). In the absence of any suggestion of deliberate manipulation and in the further absence of any objection having been rendered by the defense, we are unable to find such prejudice or impact upon substantial rights as constitutes cause for reversal.

■ Finally, Leonard Levesque contends that the district court's response to a jury inquiry was inadequate, and should in particular have included reinstruction on aiding and abetting and "mere presence." These matters, however, had been earlier covered. After reviewing both the question raised by the jury and the court's response, we conclude that the court's response was not erroneous and did not constitute an abuse of discretion.

*Affirmed.*